## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

HEATHER ROBBINS,

        Plaintiff,

    v.

PLAYHOUSE LOUNGE and JOHN
DOES 1-10,

        Defendants.

No. 1:19-cv-08387-NLH-KMW

**OPINION**

**APPEARANCES:**

JOSHUA S. BOYETTE
SWARTZ SWIDLER LLC
1101 KINGS HIGHWAY NORTH
SUITE 402
CHERRY HILL, NJ 08034

    *On behalf of Plaintiff Heather Robbins.*

MARK W. CATANZARO
21 GRANT STREET
MOUNT HOLLY, NJ 08060

    *On behalf of Defendant Playhouse Lounge.*

**HILLMAN**, **District Judge**

    This case comes before the Court on Defendant Playhouse Lounge's Motion to Compel Arbitration and Stay Litigation (ECF No. 28), which Plaintiff Heather Robbins has opposed. For the reasons expressed below, Defendant's motion will be denied without prejudice, and the parties will be directed to engage in limited discovery on the specific arbitrability-related question outlined in this Opinion.

## BACKGROUND

In July 2017, Plaintiff Heather Robbins began working as an adult dancer at the Playhouse Lounge.  Prior to starting, Defendant gave Plaintiff two options: she could either work as an employee of the club, or she could be classified as an Independent Contractor and sign a "Dance Performance Lease," an agreement under which she would technically lease certain portions of the club within which to work.  Plaintiff chose the second option, and signed both the "Business Status Selection" agreement and the "Dance Performance Lease," which together serve as the central contractual agreement governing the parties relationship here (the "Contract").

The Contract includes a section entitled "MANDATORY ARBITRATION/WAIVER OF CLASS AND COLLECTIVE ACTIONS/ATTORNEY FEES AND COSTS."  (ECF No. 28-2, Ex. B at § 21).  Subsection A of that arbitration clause provides as follows:

> EXCEPT FOR ANY GOVERNMENTAL ADMINISTRATIVE PROCEEDINGS THAT ARE NOT SUBJECT TO MANDATORY PRIVATE ARBITRATION, ANY CONTROVERSY, DISPUTE, OR CLAIM (IN THIS PARAGRAPH 21, COLLECTIVELY "CLAIM") ARISING OUT OF THIS **LEASE** OR OUT OF **ENTERTAINER** PERFORMING AT THE **CLUB** AT ANYTIME, WHETHER CONTRACTUAL, IN TORT, OR BASED UPON COMMON LAW OR STATUTE, SHALL BE EXCLUSIVELY DECIDED BY **BINDING ARBITRATION** HELD PURSUANT TO THE FEDERAL ARBITRATION ACT (THE "FAA"), AND SHALL BE ADMINISTERED BY A NEUTRAL ARBITRATOR AGREED UPON BY THE **PARTIES**, WHO SHALL BE PERMITTED TO AWARD, SUBJECT ONLY TO THE RESTRICTIONS CONTAINED IN THIS PARAGRAPH 21, ANY RELIEF AVAILABLE IN A COURT. EITHER PARTY MAY REQUEST AN ARBITRATOR EXPERIENCED IN THE ADULT

ENTERTAINMENT INDUSTRY, **THE PARTIES WAIVE ANY RIGHT TO LITIGATE SUCH CLAIMS IN A COURT OF LAW, AND WAIVE THE RIGHT TO TRIAL BY JURY.** THE PROCEEDINGS SHALL BE CONDUCTED IN ACCORDANCE WITH THAT LEVEL OF DUE PROCESS REQUIRED FOR ARBITRATIONS. **THE ARBITRATOR'S DECISION SHALL BE FINAL, SUBJECT ONLY TO REVIEW UNDER THE FAA.** THE COSTS OF ARBITRATION SHALL BE BORNE EQUALLY BY THE **ENTERTAINER** AND THE **CLUB** UNLESS THE ARBITRATOR CONCLUDES THAT A DIFFERENT ALLOCATION IS REQUIRED BY LAW. THE ARBITRATOR SHALL HAVE EXCLUSIVE AUTHORITY TO RESOLVE ANY DISPUTES OVER THE VALIDITY AND/OR ENFORCEABILITY OF ANY PART OF THIS LEASE, INCLUDING THIS ARBITRATION SECTION. ANY AWARD BY THE ARBITRATOR MAY BE ENTERED AS A JUDGMENT IN ANY COURT HAVING JURISDICTION.

Id. (emphasis in original).

Plaintiff worked at the club from July 2017 until August 2018.  During that time frame, Plaintiff worked approximately 50-60 hours a week.  She alleges that Defendant improperly classified her as an independent contractor rather than an employee, made her pay various fees and fines associated with her work at the Lounge, and repeatedly pressured her "to book private 'champagne rooms' wherein Plaintiff was expected to engage in sexual acts with patrons."  (ECF No. 1 at ¶¶ 45-46. Plaintiff eventually ceased working at Playhouse Lounge in August 2018, which she alleges was "due to the ongoing directives to engage in prostitution."  Id. at 47.

Plaintiff then filed her complaint in this action on March 12, 2019.  (ECF No. 1).  Based on the factual allegations above, Plaintiff asserts two claims for violations of the Fair Labor Standards Act, as well as claims for violations of the New

3

Jersey Wage and Hour Law, the New Jersey Wage Payment Law, the New Jersey Law Against Discrimination, the New Jersey Conscientious Employee Protections Act, and a common law claim for unjust enrichment.

On April 9, 2019, Defendant filed its first Answer to the Complaint, which did not include any affirmative defenses or reference to the arbitration clause in the Contract. (ECF No. 3). Defendant then filed a motion to amend its Answer to add an affirmative defense related to the arbitration clause on May 9, which Plaintiff consented to and this Court granted. (ECF No. 6, 11, and 12). Defendant followed this by filing its first motion to compel arbitration and stay litigation on May 30, 2019. (ECF No. 14). After Plaintiff filed a motion for discovery related to arbitration and a motion to stay the motion to compel, (ECF No. 18 and 19), this Court denied Defendant's motion to compel without prejudice, pending the resolution of the discovery motion. (ECF No. 23). The Court ultimately denied Plaintiff's motion for discovery related to arbitration without prejudice on January 22, 2020. (ECF No. 26).

Finally, Defendant renewed its motion to compel arbitration and stay litigation on September 30, 2020. (ECF No. 28). Plaintiff opposed the motion, (ECF No. 29), and Defendant filed a reply brief in further support. (ECF No. 30). Plaintiff later filed a motion for leave to file sur-reply in further

opposition of motion to compel arbitration, (ECF No. 31), which
Defendant has opposed.  (ECF No. 32).  Both motions are now ripe
for adjudication.

## DISCUSSION

### I.   Subject Matter Jurisdiction

This Court possesses subject matter jurisdiction over
Plaintiff's claims pursuant to 28 U.S.C. § 1331.

### II.   Motion for Leave to File Sur-reply

The Court first addresses Plaintiff's motion for leave to
file a sur-reply in further opposition to the motion to compel.
Local Rule 7.1(d) controls the filing of sur-replies in
situations such as this, and provides that "[n]o sur-replies are
permitted without permission of the Judge or Magistrate Judge to
whom the case is assigned."  Loc. R. Civ. P. 7.1(d)(6).  Rule
7.1(d)(1) further states that "[n]o application will be heard
unless the moving papers and a brief ... are filed with the
Clerk .... The brief shall be separate document for submission
to the Court."

The Court first notes that Plaintiff's motion does not
comply with Rule 7.1(d)(1).  Rather than filing a motion and a
separate brief, Plaintiff's motion itself includes a vague, one-
paragraph explanation of why she believes she should be granted
leave to file the attached sur-reply, as well as the Declaration
of Heather Robbins and series of further exhibits that were

filed along with it.  Nor does the motion truly explain exactly
why the Court should grant her leave.  Plaintiff's entire
argument in support of her motion is as follows:

> Defendant raises several new points in its Reply and
> requests that Plaintiff provide sworn evidence as to her
> financial situation and the circumstances by which she came
> to sign the agreements at issue.  Plaintiff requests leave
> to file this Sur-Reply in order to respond to these points
> and to provide additional evidence—including her sworn
> Declaration—to demonstrate that the Court should deny
> Defendant's motion to compel arbitration. Good cause exists
> to grant Plaintiff's request because it will allow for the
> complete development of the record and because Defendant
> will not be prejudiced by such a response.  (ECF No. 31).

However, Plaintiff fails to explain which "new points"
Defendant raised in its reply.  And while Plaintiff states that
Defendant "requests" that she provide sworn evidence as to
certain facts, it would be more accurate to say that Defendant
had simply emphasized, repeatedly, that she had not done so in
her opposition brief as part of its argument that she had failed
to demonstrate any question regarding arbitrability of her
claims.

The Court has reviewed Plaintiff's proposed sur-reply, as
well as the new declaration attached to it, and finds that it
"consists substantially of arguments originally made in her
opposition brief" to Playhouse Lounge's motion to compel and
"does not highlight any exceptional circumstances warranting the
filing of a sur-reply."  United States ex rel. Silver v.
Omnicare, Inc., No. 11-1326, 2020 WL 7022664, at *2 (D.N.J. Nov.

30, 2020).  The sur-reply itself is almost entirely an extension
of her original arguments, and attempts to introduce into the
record additional evidence in support of her claims.
Plaintiff's proposed sur-reply further pushes back on
Defendant's interpretation of legal precedent and the case law
it cited in its reply brief, which did not put forth "new
points" but instead attempted to rebut the arguments Plaintiff
made in her own opposition brief.  To the extent that the sur-
reply does put forth new substantive points and evidence, it is
in the form of citations and references to Plaintiff's new
declaration, which introduces a host of new factual claims
regarding the signing of the Contract, Plaintiff's financial
status, and Defendant's alleged pressuring of employees to
engage in prostitution.

However, Plaintiff has again entirely failed to explain why
exactly she did not or could not have filed this declaration
with her opposition brief, or why she should now be permitted to
do so after the fact.  Plaintiff herself raised the issue of
prostitution in her complaint, and her opposition brief relies
heavily on arguments regarding that subject, the prohibitive
cost to her of paying for arbitration, and the extent to which
she believes the situation in which she signed the Contract was
unfair.  She therefore had more than sufficient reason to know
that these arguments, being made in opposition to a motion to

compel arbitration, on which plaintiffs are permitted to submit additional evidence outside the complaint for the Court to consider, might require evidentiary support to be found successful.  Instead of putting such evidence forward with her properly timed opposition brief, she instead waited to do so until after Defendant filed its final reply brief, and attempted to undercut this fact by stating that she will consent to Defendant itself filing yet another sur-reply itself.

The Court does have discretion to accept and consider sur-replies when it finds doing so wise or in the interests of justice; however, as Defendant notes, Plaintiff now "seeks to submit a declaration that should have been submitted in her original response."  (ECF No. 32 at 2).  The local rules exist for a reason, and the parties may not simply extend the briefing schedule with additional briefs whenever they decide that there were additional points, or additional pieces of evidence, that they wish they had put forward previously.  Plaintiff failed to abide by Local Rule 7.1(d), and failed to put forth any persuasive reason for why she should be permitted to file a sur-reply simply because she wishes another opportunity to respond to Defendant's arguments.  Accordingly, her motion will be denied.[1]

---

[1] The Court notes here that despite having declined to consider the additional evidence in Plaintiff's declaration, as explained

### III. **Legal Standard for Motion to Compel Arbitration**

"[W]hen it is clear on the face of the complaint [or documents relied upon by the complaint] that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement, a district court must compel arbitration under a Rule 12(b)(6) pleading standard ...." MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds, 974 F.3d 386, 406 (3d Cir. 2020). But if (1) the materials subject to review on a Rule 12(b)(6) motion are unclear as to the arbitrability question, or (2) the parties have come forward with facts putting the arbitrability question at issue, then the court may order limited discovery and then consider the arbitrability question on a summary judgment standard. Guidotti v. Legal Helpers Debt Resol., LLC, 716 F.3d 764, 774 (3d Cir. 2013) (quotation marks and citation omitted).

### IV. **Motion to Compel Arbitration**

Defendant has moved to stay this action and compel arbitration of Plaintiff's claims. Defendant bases its motion

---

below it will be denying Defendant's motion to compel and permitting Plaintiff to pursue limited discovery on the issue of whether arbitration would be cost-prohibitive for her. This Opinion further explains that the Court has found that the question of the legality of the contract must be reserved for arbitration, and therefore the Court cannot consider the evidence Plaintiff has put forward in support of that argument. Accordingly, its denial of the motion for leave, at the very least, has no substantive impact on the consideration of those challenges.

9

on the arbitration provision, which the Court excerpted above. Plaintiff, unsurprisingly, opposes the motion to compel. Defendant categorizes her opposition brief as "throwing everything against the wall and hoping that some of it sticks;" viewed more charitably, Plaintiff has put forward a variety of separate arguments for why the motion must be denied, and why her claims must either be allowed to proceed in this Court, or alternatively why she must be permitted to pursue limited discovery regarding the validity and enforceability of the contract and its arbitration clause.  For the sake of clarity, the Court will address those arguments in the order in which they are presented in Plaintiff's opposition brief.

### A. **Waiver of Right to Arbitrate**

Plaintiff's opposition brief focuses for the most part on challenges made regarding the contract and the arbitration clause under state law.  However, Plaintiff contends somewhat fleetingly that Defendant's motion must be denied because Defendant has waived the right arbitrate her claims "by failing to timely refile its motion for arbitration and by acting inconsistently with a desire to arbitrate."  (ECF No. 29 at 3). The Court will briefly address this contention.

While Plaintiff herself cites to no caselaw supporting this contention, the Third Circuit has repeatedly recognized that a court may refuse to enforce an arbitration agreement where a

"party has acted inconsistently with the right to arbitrate," and directed that courts "will not hesitate to hold that the right to arbitrate has been waived where a sufficient showing of prejudice has been made by the party seeking to avoid arbitration."  In re Pharmacy Ben. Managers Antitrust Litig., 700 F.3d 109, 117 (3d Cir. 2012) (quoting Nino v. Jewelry Exch., Inc., 609 F.3d 191, 208 (3d Cir. 2010)).  "[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation conduct."  Zimmer v. CooperNeff Advisors, Inc., 523 F.3d 224, 231 (3d Cir. 2008).  The Third Circuit has "identified six nonexclusive factors to guide the prejudice inquiry:"

> (1) timeliness or lack thereof of the motion to arbitrate; (2) extent to which the party seeking arbitration has contested the merits of the opposing party's claims; (3) whether the party seeking arbitration informed its adversary of its intent to pursue arbitration prior to seeking to enjoin the court proceedings; (4) the extent to which a party seeking arbitration engaged in non-merits motion practice; (5) the party's acquiescence to the court's pretrial orders; and (6) the extent to which the parties have engaged in discovery.

Gray Holdco, Inc. v. Cassady, 654 F.3d 444, 451 (3d Cir. 2011) (citing Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 926–27 (3d Cir. 1992)).

Having reviewed the procedural posture and history of this case, the Court finds that Defendant has not waived its right to arbitrate.  Plaintiff has made no effort to demonstrate true

prejudice, and her entire argument for waiver appears to be that Defendant waited nine months from Judge Williams' denial of Plaintiff's motion for arbitration-related discovery to file the present motion.  However, Plaintiff's argument ignores that this is not the first motion to compel that Defendant has filed in this action; Defendant, in filing the present motion, renewed its initial motion to compel, first filed over two years ago, which was denied without prejudice by the Court subject to the resolution of Plaintiff's discovery motion.  (See ECF No. 23).

Admittedly, Defendant did initially final an Answer to the complaint, which did not assert arbitration as an affirmative defense and did not pursue the right to compel arbitration. (ECF No. 3).  However, Defendant shortly after filed a motion to amend the Answer to assert the affirmative defense of arbitration, which Plaintiff consented to and this Court granted, and then immediately filed its initial motion to compel.  (ECF No 6, 11, and 14).  Defendant's initial Answer to the complaint, and delay in renewing its motion to compel arbitration, is somewhat inconsistent with a desire to arbitrate Plaintiff's claims.  However, as the Third Circuit has repeatedly emphasized, prejudice is the touchstone of this analysis, and the Court must look to the other factors outlined above.

Since Defendant first filed its motion to amend its Answer, it has been consistent and forthright in its desire to compel arbitration, having filed two motions to compel and having opposed Plaintiff's motion for arbitration-related discovery on that basis.  Neither party has engaged in any briefing or motions practice in this action unrelated to the question of arbitration; every substantive motion filed in this action to this date has been directly focused on that question.  Nor have the parties appeared to engage in any discovery to this date. While the Court recognizes that Plaintiff may believe she has been prejudiced by the delays in litigating the question of arbitrability, the Third Circuit has made clear that "waiver will normally be found only where the demand for arbitration came long after the suit commenced and when both parties had engaged in extensive discovery."  Nino, 609 F.3d at 126 (quoting PaineWebber Inc. v. Faragalli, 61 F.3d 1063, 1068–69 (3d Cir. 1995)).  This is not such a case, and the Court finds that Plaintiff has not waived its right to arbitrate.  The Court will therefore turn to the various challenges Plaintiff has raised to the contract and the arbitration clause found within.

B. **Legal Framework for Assessing Threshold Arbitrability Questions**

Before the Court focuses its attention on the substance of the parties' arguments, it is necessary to outline the relevant

doctrine in this Circuit regarding the proper role of this Court in ruling on questions of arbitrability, as it is central to the proper adjudication of the present motion and a point of dispute between the parties.  Plaintiff here has put forward a multitude of arguments aimed at different aspects of the contractual agreement between her and Playhouse Lounge, which have put front and center the "mind-bending" threshold question of which arguments are appropriate for this Court to handle, and which must be reserved for an arbitrator to assess and rule on.  See MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds, 974 F.3d 386, 392 (3d Cir. 2020).

"It is well established that the Federal Arbitration Act (FAA) reflects a 'strong federal policy in favor of the resolution of disputes through arbitration.'" Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (quoting Alexander v. Anthony Int'l, L.P., 341 F.3d 256, 263 (3d Cir. 2003)).  Before a court may implement this preference, it generally must first determine "that (1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement."  Id. (citing Trippe Mfg. Co. v. Niles Audio Corp, 401 F.3d 529, 532 (3d Cir. 2005)).  However, as simple as that mandate may initially seem, courts have long struggled to fill in the specific contours of this area of the law.

Faced with contracts like the one here, courts have acknowledged three related but conceptually separate forms of contractual agreement that are directly relevant to this analysis: (1) the container contract, which governs the parties contractual relationship as a whole; (2) the arbitration clause, which is contained within the contract and mandates that certain disputes must be submitted to arbitration; and (3) the delegation provision, which is generally contained within the arbitration clause, and delegates to the arbitrator the ability to decide gateway questions of arbitrability, thereby allowing the arbitrator to "decide their own jurisdiction."  See MZM Const., 974 F.3d at 398-99.  This contractual setup therefore exists as "something akin to Russian nesting dolls," Rent-A-Center, 561 U.S. at 85 (Stevens., J. dissenting), in which a delegation provision serves as a sort of "mini-arbitration agreement within a broader arbitration agreement within a broader contract."  MZM Const., 974 F.3d at 399.

Each of these different agreements brings with it its own set of threshold arbitrability questions.  First, at the center of this inquiry is what is known as the "severability doctrine."  The Supreme Court, in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), closely examined the Federal Arbitration Act and held that arbitration clauses are "severable" and therefore independently

enforceable from the rest of the contracts in which they are found.  Id. at 406.  At its core, this means that parties generally cannot avoid arbitration by simply waging attacks on the larger contract as a whole; instead, if they wish to avoid being compelled to arbitrate their claims, they usually must put forward a challenge to "the arbitration clause itself."  Id. at 403.

In the years since Prima Paint, our Court of Appeals has further detailed exactly what the severability doctrine means for the arbitrability of attacks on a container contract. First, in Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104 (3d Cir. 2000), the Third Circuit was faced with the question of "who decides whether an arbitration agreement exists when the formation or the existence of the container contract is disputed."  MZM Constr., 974 F.3d at 397.  The Sandvik Court, recognizing that § 4 of the FAA provides that a federal court must compel arbitration "upon being satisfied that the making of the agreement for arbitration ... is not in issue," held that courts are "affirmatively require[d] . . . to decide questions about the formation or existence of an arbitration agreement, namely the element of mutual assent."  Id. at 397-98 (citing Sandvik, 220 F.3d at 108-09).  Since "the doctrine of severability presumes an underlying, existent, agreement," courts oftentimes must first rule on the formation or existence

16

of the container contract.  Id. at 106.  The Third Circuit
described "this threshold determination [as] 'a necessary
prerequisite' in fulfilling the court's gatekeeping function."
Id. at 107.

Accordingly, in a case involving only a container contract
and an arbitration clause, courts will adjudicate only attacks
on the existence or formation of the container contract, and
attacks directed at the arbitration clause itself.  However,
things are oftentimes not that simple in cases like the one
presently before this Court, where the Contract further provides
that an arbitrator will have exclusive authority to assess not
only disputes between the parties, but also shall resolve any
disputes regarding the validity or enforceability of the
arbitration provision itself.  (See ECF No. 28-2, Ex. B at ¶
21(a)) ("The arbitrator shall have exclusive authority to
resolve any disputes over the validity and/or enforceability of
any part of this lease, including this arbitration section.").
As alluded to above, the Supreme Court has made clear that
"parties can agree to arbitrate 'gateway' questions of
'arbitrability,' such as whether the parties have agreed to
arbitrate or whether their agreement covers a particular
controversy."  Rent-A-Center, West, Inc. v. Jackson, 561 U.S.
63, 68-69 (2010).

The Third Circuit recently addressed the impact of such delegation provisions on its prior holding requiring courts to assess attacks on the formation or existence of a container contract in MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds, 974 F.3d 386 (3d Cir. 2020).  There, the Third Circuit was faced with a delegation provision that explicitly reserved for the arbitrator the authority to assess arguments related to the existence of the container contract.  Id. at 393. The MZM Court noted that underlying its Sandvik holding was the understanding that "[l]ack of assent to the container contract necessarily implicates the status of the arbitration agreement, when the container contract and the arbitration provision depend on the same act for their legal effect."  Id. at 400 (citing Sandvik, 220 F.3d at 109, 111).  Finding that this reasoning applied just the same to the scenario before it, the Third Circuit found that it is "inevitable that a court will need to decide questions about the parties' mutual assent to the container contract to satisfy itself that an arbitration agreement exists and vice versa," even "when the container contract includes or incorporates a delegation provision."  Id. Accordingly, MZM extended Sandvik's holding even to cases with delegation provisions reserving the question of the container contract's existence to an arbitrator — while still providing parties an out, by acknowledging their ability to delegate such

18

questions to an arbitrator by clearly and unmistakably agreeing
to arbitrate questions of contract formation within their
contractual relationship in an entirely separate contract with
no underlying question regarding its formation.  Id. at 402.

Delegation provisions such as the one here raise one
further point of contention: although courts generally have the
authority to adjudicate attacks specifically directed at an
arbitration clause itself, delegation provisions reserve the
question of whether an arbitration clause is valid and
enforceable for the arbitrator.  When an arbitration clause
contains such a delegation provision, the court therefore cannot
reach the question of the arbitration clause's enforceability
unless the delegation clause itself is unenforceable.  MacDonald
v. CashCall, Inc., 883 F.3d 220, 226 (3d Cir. 2018).

The Supreme Court and the Third Circuit have made clear
that even though a delegation provision will normally be found
within an arbitration clause, a party cannot avoid arbitration
of the clause's enforceability simply by attacking the
arbitration clause writ large.  "[C]ontesting the validity of an
arbitration agreement as a whole, without specifically disputing
the delegation clause contained therein, is not sufficient to
challenge the delegation provision."  Id. (citing Rent-A-Center,
561 U.S. at 70-75).  Instead, the party must contest the
enforceability of the delegation provision by "challeng[ing] the

19

delegation provision specifically." Rent-A-Center, 561 U.S. at 70.  This burden, however, is more formalistic than substantive, as the Third Circuit has held that in "challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions."  MacDonald, 883 F.3d at 226-27.  In MacDonald, for example, the Third Circuit held that a party had sufficiently challenged a delegation provision simply by stating in its briefing that challenges to the arbitration provision applied just the same to the delegation provision.  Id. at 227.

With the legal framework for assessing questions of arbitrability laid out in stark terms, the Court will now turn to addressing the substance of the parties' challenges to the contract, the arbitration clause, and the delegation provision. While the Court will dig into certain of these points further below, this background lays the groundwork for the analysis that follows.

## C. **Plaintiff's Unconscionability Arguments**

Plaintiff initially puts forward a series of arguments that the arbitration clause and the delegation provision are both procedurally and substantively unconscionable.  Although the delegation provision nominally reserves ruling on such issues regarding the arbitration provision for the arbitrator, the Court finds that Plaintiff, through her repeated contention

throughout her opposition brief that these arguments render both the arbitration clause and the delegation provision unconscionable, has sufficiently challenged the delegation provision under this Circuit's doctrine.  Accordingly, the Court must engage in its gatekeeping duty and assess her arguments.

In determining whether a valid arbitration agreement exists, federal courts apply applicable state contract law. Aliments Krispy Kernels, Inc. v. Nichols Farms, 851 F.3d 283, 289 (3d Cir. 2017).  Here, the contract provides that it "shall be interpreted pursuant to the laws of the state in which the Club is located."  (ECF No. 28-2, Ex. B at ¶ 20).  Playhouse Lounge is located in New Jersey, and both parties appear to agree that New jersey law applies.  "In applying the relevant state contract law, a court may also hold that an agreement to arbitrate is 'unenforceable based on a generally applicable contractual defense, such as unconscionability.'"  Parilla v. IAP Worldwide Servs., VI, Inc., 368 F.3d 269, 276 (3d Cir. 2004) (citing Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).

## 1. **Procedural Unconscionability**

First, Plaintiff contends that both the arbitration clause and delegation provision are procedurally unconscionable because they are contracts of adhesion.  Contracts of adhesion are "agreements that are 'presented on a take-it-or leave-it basis,

commonly on a standardized printed form, without opportunity for the 'adhering' party to negotiate....'" Uddin v. Sears, Roebuck & Co., No. 13-6504, 2014 WL 1310292, at *7 (D.N.J. Mar. 31, 2014) (quoting Muhammad v. Cty. Bank of Rehoboth Beach, Delaware, 189 N.J. 1, 15 (2006)).  According to Plaintiff, "[i]n New Jersey, an agreement is procedurally unconscionable if it is a contract of adhesion.  (ECF No. 29 at 10-11) (citing Rudbart v. N. Jersey Dist. Water Supply Com., 127 N.J. 344, 354 (1992)).

However, contrary to Plaintiff's assertion of a hard rule against contracts of adhesion, New Jersey courts have held that a finding that a contract is a contract of adhesion does not necessarily, on its own, serve as proof of unconscionability. Delta Funding Corp. v. Harris, 189 N.J. 28, 39 (2006).  Instead, identifying an agreement as a contract of adhesion represents "the beginning, not the end, of the inquiry into whether a contract, or any specific term therein, should be deemed unenforceable." Uddin, 2014 WL 1310292, at *7 (quoting Muhammad, 912 A.2d at 96).

Rather than simply declaring all contracts of adhesion procedurally unconscionable, the New Jersey Supreme Court has held that the defense of unconscionability "calls for a fact-sensitive analysis in each case, even when a contract of adhesion is involved." Delta Funding Corp., 189 N.J. at 39.

22

New Jersey courts specifically require analysis of four factors: "(1) the subject matter of the contract, (2) the parties' relative bargaining positions, (3) the degree of economic compulsion motivating the 'adhering' party, and (4) the public interests affected by the contract." Uddin, 2014 WL 1310292, at *7 (quoting Muhammad, 912 A.2d at 97). If a plaintiff fails to adequately show that a contract of adhesion was unfairly signed under these factors, she fails to prove procedural unconscionability. Id.

There does not appear to be any true dispute here that the Contract was a contract of adhesion; Defendant openly states that "[t]here is no question that the dancer agreement was a standardized form," (ECF No. 30 at 4), and rather than disputing Plaintiff's claim that she had no opportunity to modify it or negotiate its specific terms, Defendant simply asserts "so what? Plaintiff has never questioned the propriety of the document. Defendant does not have the burden to establish that they would negotiate terms or otherwise modify the agreement." Id. at 5. Courts faced with similar scenarios have easily found contracts to be contracts of adhesion. See Montgomery v. Bristol-Myers Squibb Co., No. 3:19-cv-19948-FLW-DEA, 2020 WL 3169373, at *4 (D.N.J. June 15, 2020) ("[T]here is no dispute that the Agreement is a contract of adhesion, because Plaintiff did not have the opportunity to modify it.").

23

However, as outlined above, such a finding does not require the Court to hold the Contract procedurally unconscionable unless Plaintiff has sufficiently demonstrated that the contract was unfair under the factors outlined by the New Jersey courts. Plaintiff has largely failed to do so.  In her discussion of procedural unconscionability, her opposition brief simply walks through the reasons why the Contract qualifies as a contract of adhesion, and then asserts that "the disparity in bargaining power coupled with the fact that the contract is presented on a take-it-or-leave-it-basis is sufficient to establish the procedural unconscionability of the agreement."  (ECF No. 29 at 11).

But contrary to Plaintiff's assertion, the New Jersey Supreme Court itself has noted that "[v]irtually every court that has considered the adhesive effect of arbitration provisions in employment applications or employment agreements has upheld the arbitration provision contained therein despite potentially unequal bargaining power between employer and employee."  Martindale v. Sandvik, Inc., 173 N.J. 76, 90, 800 A.2d 872 (2002).  Plaintiff here has put forward no further argument or evidence of procedural unconscionability.  While elsewhere in her briefing she discusses the imbalance of financial power between her and Defendant, she has similarly failed to demonstrate "circumstances substantially more

egregious than [] ordinary economic pressure" that might impact the fairness the signing of the Contract.  Young v. The Prudential Ins. Co. of Am., Inc., 688 A.2d 1069, 1078 (N.J. Super. Ct. App. Div. 1996).

The Court notes that Plaintiff does reference the factors outlined above for assessing procedural unconscionability in the section of her brief discussing substantive unconscionability. In that section, she says that "[a]fter determining that an agreement is a contract of adhesion, the court must 'determine as a matter of policy whether to enforce the unilaterally-fixed terms of the [agreement].'"  (ECF No. 29 at 12) (quoting Rudbart, 127 N.J. at 354).  While this statement is correct, Plaintiff then goes forward to provide arguments for why specific provisions are substantively unconscionable under New Jersey law.  In this way, Plaintiff appears to have conflated the analysis for arguments of procedural unconscionability, which "pertains to the process by which an agreement is reached and the form of an agreement," and substantive unconscionability, which "refers to contractual terms that are unreasonably or grossly favorable to one side."  Harris v. Green Tree Financial Corp., 183 F.3d 173, 181 (3d Cir. 1999).  The Court will address Plaintiff's arguments regarding the substantive unconscionability of specific provisions in the next section of this Opinion, separate and apart from its procedural

analysis.  Having provided nothing further upon which the Court
could rely to find the contract to be procedurally unfair,
Plaintiff's procedural unconscionability argument fails.

### 2. __Substantive Unconscionability__

While Plaintiff only broadly argued that the Contract was
procedurally unconscionable due to its nature as a contract of
adhesion, she has pointed to multiple specific provisions that
she argues render the arbitration clause and delegation
provision substantively unconscionable as well.  "New Jersey
courts may find a contract term substantively unconscionable if
it is 'excessively disproportionate' and involves an 'exchange
of obligations so one-sided as to shock the court's
conscience.'"  Agrabright v. Rheem Mfg. Co., 258 F. Supp. 3d
470, 481 (D.N.J. 2017) (quoting Delta Funding Corp., 189 N.J. at
55).

Plaintiff first argues that the arbitration clause's fee-
shifting provisions meet the standard for substantive
unconscionability.  Both the United States Supreme Court and the
New Jersey Supreme Court have previously recognized that in some
situations, an arbitration agreement can be made unenforceable
by the inclusion of provisions which render arbitration
prohibitively expensive for a plaintiff.  See Delta Funding
Corp., 912 A.2d at 113; Green Tree Fin. Corp.-Ala. v. Randolph,
531 U.S. 79, 90 (2000).  Determining whether a specific

26

provision reaches that level requires a "case-by-case" analysis. Spinetti v. Serv. Corp. Int'l, 324 F.3d 212, 216 (3d Cir. 2003). Based on this principle, "courts in the Third Circuit and the State of New Jersey have found an arbitration agreement unenforceable in three scenarios: (1) the provision prohibits fee-shifting for statutory claims that would otherwise allow for fee-shifting, (2) the provision shifts all costs to the employee (or risks doing so), and (3) the provision splits costs between the employee and employer." Tharpe v. Securitas Security Services USA, Inc., No. 20-13267 (KM) (ESK), 2021 WL 717362, at *5 (D.N.J. Feb. 24, 2021) (internal citations omitted).

The arbitration clause here clearly raises concerns under both the second and third scenarios. Section 21(a) of the arbitration clause first provides that "the costs of arbitration shall be borne equally by the entertainer and the club." (ECF No. 28-2, Ex. B). Section 21(d) then goes a step further, requiring that "any ruling arising out of a claim between the parties shall, to the extent not precluded by law, award costs incurred for the proceedings, including reasonable attorney fees, to the prevailing party." Id. Finally, if those two provisions were not enough, Section 21(c) provides that if Plaintiff challenges the arbitration requirements in the contract, or forces Defendant to litigate to enforce them — as she has here, by filing a lawsuit in federal court and opposing

27

the motion to compel — then "the prevailing party to such proceedings shall be entitled to an award of all costs, including reasonable attorney fees, incurred in litigating such issues." Id.

Plaintiff is correct, then, that the fee-shifting provisions found in the contract could potentially make arbitration so prohibitively expensive for her that the arbitration clause and delegation provision would be rendered unconscionable.  However, based only on the current record before it, the Court cannot truly determine at this stage whether the costs here would reach that level for this plaintiff in this specific case.  When the latter two categories of fee-shifting provisions are present, the Third Circuit requires plaintiffs to provide evidence of the likely costs and their inability to pay them.  Parilla v. IAP Worldwide Servs., Inc., 368 F.3d 269, 284-85 (3d Cir. 2004).  The Third Circuit has recognized that discovery on this question is often necessary for a plaintiff to even have the possibility of making the relevant showing, and has remanded multiple cases where a court has ruled on a cost-sharing provision without an adequately developed factual record.  See Blair v. Scott Specialty Gases, 283 F.3d 595, 609-10 (3d Cir. 2002); Parilla, 368 F.3d at 284-85; Antkowiak v. TaxMasters, 455 F. App'x 156, 160-61 (3d Cir. 2011).

As another judge in this District recently noted, courts in the Third Circuit have "taken various approaches to the issue of what circumstances will trigger" a plaintiff's right to discovery on this issue; some have ordered limited discovery when a plaintiff simply raised the question of whether a provision rendered arbitration cost-prohibitive in their brief, whereas others have declined to do so without the plaintiff having put forward some initial evidence, generally in the form of a separate affidavit.  See Tharpe, 2021 WL 717362, at *6 (citing cases).  This Court, having reviewed the relevant caselaw, agrees with the court in Tharpe that "the Third Circuit's strong language in Blair and history of remands indicate that factual development is required (or, at the least, wise)."  Id.  Similarly, when speaking to the more general standards for courts assessing motions to compel, the Third Circuit has strongly emphasized the need for courts to allow for limited discovery when a plaintiff has put forward sufficient facts to place arbitrability in issue, or when there is unclarity based on the complaint as to whether an agreement to arbitrate exists.  Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 771-76 (3d Cir. 2013).

Here, the Court finds that Plaintiff has sufficiently raised this concern, and discovery on this question is necessary.  While, as Defendant points out, she has not put

forward a specific affidavit outlining her ability to pay,
Plaintiff has explicitly argued that the costs of arbitration
would be particularly prohibitive to her, "an adult entertainer
working mainly for tips."  (ECF No. 29 at 12).  Although it is a
close call, the Court believes that Plaintiff has at least
plausibly alleged that she is financially vulnerable enough that
discovery will reveal arbitration would be too costly for her to
pursue under the terms of the contract.  Accordingly, the Court
will deny Defendant's motion to compel without prejudice, and
will direct the parties to engage in limited discovery on this
specific issue.[2]

Plaintiff has also pointed to a series of provisions
related to the selection of the arbitrator, which she claims are
also substantively unconscionable.  Specifically, Plaintiff
emphasizes that "the agreement does not designate an arbitration
service or delimit the types of arbitrators who may be retained,
limits the arbitrators to individuals with 'experience[] in the
adult entertainment industry,' and affords the Defendant an

---

[2] The Court points out, however, that a finding that arbitration
would be cost-prohibitive would not necessarily preclude
arbitration of Plaintiff's claims, as an invalid cost provision
may be severed from an agreement before compelling arbitration.
Spinetti, 324 F.3d at 214; Delta, 912 A.2d at 114-15; ECF No.
28-2, Ex. B at § 19 ("If any provision of this Lease is declared
to be illegal or unenforceable, this Lease shall, to the extent
possible, be interpreted as if that provision was not a part of
this Lease.").  The Court expects that the parties will address
the question of severability in their future briefing.

absolute veto over the choice of arbitrator." (ECF No. 29 at 12). However, Plaintiffs' brief fails to provide any support for how these specific provisions are "excessively disproportionate," or involve an "exchange of obligations so one-sided as to shock the court's conscience." Agrabright, 258 F. Supp. 3d at 481 (quoting Delta Funding Corp., 189 N.J. at 55). Instead, citing no case law, Plaintiff simply asserts that these provisions "exacerbate" the concerns raised by the fee-shifting provisions. While the Court has already held that Plaintiff will be allowed to seek limited discovery regarding the fee-shifting provisions, Plaintiff has failed to raise any sufficient arguments that the arbitrator selection provisions sufficient are themselves individually unconscionable.

### D. **Lack of Mutual Assent**

Plaintiff's brief reference to the contractual provisions governing the selection of an arbitrator in her unconscionability discussion is not the only argument she has raised as to those provisions. She also contends that there are "insufficient criteria related to the selection of the arbitration venue and arbitrator" in the agreement, which demonstrate that there was a lack of mutual assent to the terms of the contract. (ECF No. 29 at 13). As the Court explained above, this Court has the threshold duty to assess questions

31

regarding whether there was mutual assent to the creation of an agreement to arbitrate.  MZM Constr., 974 F.3d at 398.

Plaintiff specifically refers the Court to NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 24 A.3d 777 (N.J. Super. Ct. App. Div. 2011), in which the New Jersey Superior Court's Appellate Division recognized that, under New Jersey law, courts will invalidate arbitration agreements for lack of mutual assent when said agreements "do not clearly and consistently express the nature and locale of the arbitration forum itself." Id. at 794. This appears to be an accurate statement of New Jersey law. However, as Defendant points out, the contractual provisions addressed by the court in NAACP of Camden are largely dissimilar to those found here.  There, the court was faced with a series of provisions in different agreements which were not only inconsistent, but at times blatantly contradicted each other. Id. at 794-95.

That is not the case here.  Plaintiff has pointed to no contradictions or inconsistencies in the arbitration agreement; instead, she has argued that the agreement's failure to include additional, specific information regarding the process by which an arbitrator and arbitration forum must be selected necessitates a finding that there was no mutual assent to the agreement.  While NAACP of Camden is therefore not on point to

32

this analysis, the New Jersey Supreme Court recently addressed a case that raised this exact issue.

In Flanzman v. Jenny Craig, Inc., 244 N.J. 119 (2020), the lower state appellate court had held that a failure to designate in the agreement an "arbitral institution" or to include a description of "the general process for selecting an arbitration mechanism or setting" meant that the parties "did not understand [their] rights under the arbitration agreement that ostensibly foreclosed [the plaintiff's] right to a jury trial." Id. at 138-39. Much like the agreement here, the parties in Flanzman had failed to provide such information in their arbitration agreement, and the lower court therefore found a lack of mutual assent and refused to enforce the agreement.

The New Jersey Supreme Court, after reviewing New Jersey law regarding arbitration agreements in detail, reversed the lower court's holding and reached the opposite conclusion. First, Flanzman noted that "[n]o New Jersey statutory provision or prior decision has elevated the selection of an 'arbitral institution' or the designation of a 'general process for selecting an arbitration mechanism or setting' to the status of essential contract terms, without which an arbitration agreement must fail." Id. at 139. To the contrary, New Jersey law, through the New Jersey Arbitration Act, explicitly provides default provisions for the selection of an arbitrator, which

33

"may operate in the absence of contractual terms prescribing such procedures." Id.  Those provisions, found at N.J.S.A. 2A:23B-11-15, provide a mechanism for the selection of an arbitrator that can fill the gaps found in an arbitration agreement.

The Flanzman Court did note, and this Court agrees, that as a general matter a "detailed description of the contemplated arbitration in an arbitration agreement enhances the clarity of that agreement . . . [and] may avoid future disputes." Id. at 140.  However, it explicitly held that under New Jersey law, "the parties' omission of a designated arbitral institution or general process for selecting an arbitration mechanism or setting . . . [does] not warrant the invalidation of an arbitration agreement.  Parties who have expressed mutual assent to the arbitration of their disputes instead of a court proceeding may choose to defer the choice of an arbitrator to a later stage, when they will be in a position to assess the scope and subject of the dispute, the complexity of the proposed arbitration, and considerations of timing and cost." Id. at 140-41.

Accordingly, the Court finds that the lack of more specific provisions outlining the process for selecting an arbitrator and arbitration forum does not demonstrate a lack of mutual assent.

**D. Illegality of the Container Contract**

Plaintiff next argues that the container contract itself "is illegal and void and unenforceable *ab initio* as a contract of prostitution." (ECF No. 29 at 14). Plaintiff's argument, at its core, is that the contract she signed with Defendant was in reality a contract intended to promote prostitution at Playhouse Lounge. This, she argues, renders the contract itself illegal — an issue she believes this Court must address itself, instead of reserving for judgment by an arbitrator.

As Plaintiff notes, New Jersey law prohibits prostitution and the promotion of prostitution, N.J.S.A. 2C:34-1, and the City of Burlington further prohibits operating an adult establishment as a "house of prostitution." Code of the City of Burlington, Part II, Ch. 66, § 66-15(B). And "New Jersey law has long recognized that illegal contracts are unenforceable." Guiuan v. Villaflor, No. 7-6064, 2012 WL 3526681, at *4 (D.N.J. Aug. 15, 2012) (citing Naimo v. La Fianza, 369 A.2d 987, 990 (N.J. Super. Ct. App. Div. 1976) (noting "[i]t is well established that illegal contracts are unenforceable" and "[a]ny contract made in consideration of an act forbidden by law or against public policy is unenforceable and the illegality of the contract will constitute a good defense at law as well as in equity")).

35

The threshold inquiry here though, as ever, is whether a challenge to the legality of the contract is one that must be decided by this Court in the first instance, or one that must be left to the arbitrator — and therefore whether this Court can even consider or address any potential evidence regarding promotion of prostitution that Plaintiff has put forward. Plaintiff's explanation for why she believes this to be an issue for this Court to adjudicate is straightforward: her claim is that (1) under New Jersey law, the contract was formed for an illegal purpose and is therefore void *ab initio*, and (2) under Third Circuit doctrine as outlined in <u>MZM Constr.</u>, such arguments must be assessed by the Court, not an arbitrator. Defendant, alternatively, emphasizes the fact that <u>MZM</u> was focused on issues of fraud in the execution, which is different than the argument put forward by Plaintiff here.

As the Court outlined above, the Supreme Court and the Third Circuit have put forward a general dividing line between which issues are to be decided as threshold question by federal courts, and which must be reserved for the arbitrator: attacks on the contract as a whole are to be adjudicated in arbitration, whereas attacks on the arbitration or delegation provisions themselves are generally issues for the courts. However, as the Third Circuit explained in <u>MZM</u>, this is not a universal hardline rule. Instead, when the formation of the container contract

36

itself is in issue, the Court must resolve the dispute, as it calls into question the existence of the arbitration agreement in the first place.

In the present case, however, Plaintiff appears to have identified a point of potential confusion generated by the Third Circuit's explication of this doctrinal point in MZM.  Plaintiff specifically explains the MZM opinion as generally holding "that where a contract is challenged on formation grounds such that the agreements contained therein are void *ab initio*, the Court determines whether a valid or void contract exists," which she believes necessarily encompasses the question of whether the contract was illegal.  (ECF No. 29 at 2) (citing MZM, 974 F.3d at 400).

Plaintiff's initial description of the MZM Court's explanation of its holding is not necessarily incorrect.  The Court of Appeals, in explaining why courts must address claims of fraud in the execution while claims of fraud in the inducement are left to arbitrators, directly relied upon the fact that fraud in the execution "renders the entire agreement 'void *ab initio*' as if it never existed," whereas fraud in the inducement only renders an agreement 'voidable.'"  MZM, 974 F.3d at 405-06 (citing Sandvik, 220 F.3d at 107, 109-10).  Similarly, as explained above, the Third Circuit pointed to its earlier holding in Sandvik that 9 U.S.C. § 4 requires courts to "pass[]

37

judgment on the formation or existence of the container
contract" itself.  Id at 399 (citing Sandvik, 220 F.3d at 106).
And as Plaintiff notes, New Jersey law is clear that an illegal
contract is void *ab initio* and "it is as though the policy never
came into existence."  Sun Life Assurance Company of Canada v.
Wells Fargo Bank, N.A., 208 A.3d 839, 857 (N.J. 2019) (citing
D'Agostino v. Maldonado, 216 N.J. 168, 194 n.4, 78 A.3d 527
(2013)).

The Court recognizes that a defensible — perhaps even
somewhat persuasive — extension of this logic would be that
arguments that a container contract is illegal, and therefore
void *ab initio* under state contract law, are questions going to
the formation or existence of the contract which a court must
exercise its gatekeeping duty to address.  However, in looking
only to the underlying logic of the MZM opinion, Plaintiff has
ignored the specific holding of Sandvik which the MZM opinion
was extending to cases where a delegation provision delegates
questions regarding the existence of the contract to an
arbitrator: that the FAA "'affirmatively requires' a court to
decide questions about the formation or existence of an
arbitration agreement, *namely the element of mutual assent*."
MZM, 974 F.3d at 397-98 (quoting Sandvik, 220 F.3d at 108-09).
In fact, the Third Circuit panel in MZM went so far as to
explicitly state that "[w]e read Sandvik as being limited only

to claims that, if proven, would negate the element of mutual assent." Id. at 109 n.7.

Accordingly, MZM itself did not directly tackle the issue put forward by Plaintiff here; nor has the Third Circuit appeared to explicitly delineate itself where arguments that a contract is void *ab initio* under state law fall within the doctrinal framework for assessing questions of arbitrability that our Court of Appeals has constructed.  However, our Supreme Court has addressed this exact question — and held that Plaintiff's arguments must be reserved for arbitration.

In Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440 (2006), the Supreme Court was faced with a case in which the trial court had held "that a court rather than an arbitrator should resolve a claim that a contract is illegal and void ab initio," and the Florida Supreme Court had found that enforcing an arbitration agreement in a contract challenged as unlawful would violate state public policy and contract law.  Id. at 443. The Supreme Court, in addressing the specific argument before it, divided attacks on arbitrability into two categories reminiscent of those outlined by the Third Circuit: "One type challenges specifically the validity of the agreement to arbitrate . . . The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground

that the illegality of one of the contract's provisions renders the whole contract invalid." Id. at 444 (internal citations omitted).  It then held that the plaintiff's argument that the contract was "criminal on its face" because it violated Florida's laws against usurious interest rates, and was therefore void *ab initio* as an illegal contract, fell within the second category of challenges that must be reserved for arbitration.  Id. at 443-44.

Plaintiff may wish to distinguish the facts of Buckeye from the scenario here, where Plaintiff points not to a specific provision of the contract, but rather argues that the general purpose of the contract itself was illegal.  However, this Court is not alone in interpreting Buckeye Check Cashing to preclude it from addressing the question of contract illegality presented here.  While the Third Circuit's more recent detailed explanations of its arbitrability doctrine have not addressed this precise question, our Court of Appeals previously noted that "Buckeye Check Cashing itself held that a challenge to a contract's legality was arbitrable, even though illegality would have rendered that contract void rather than voidable." SBRMCOA, LLC v. Bayside Resort, Inc., 707 F.3d 267, 274 (3d Cir. 2013).  Courts of Appeals in other circuits have approached the Buckeye Check Cashing decision in the same manner, generally describing it as having held that the plaintiff's argument that

the contract was void *ab initio* for illegality was a challenge
to the *validity* of the contract, rather than a challenge as to
whether the contract was ever formed.  See, e.g., In re Cox
Enterprises, Inc. Set-top Cable Television Box Antitrust Litig.,
835 F.3d 1195, 1210-11 (10th Cir. 2016) (describing Buckeye as
holding that argument that contract "was void for illegality"
because it "violated state lending and consumer-protection laws"
was an arbitrable "challenge to the validity of the contract as
a whole"); Moran v. Svete, 366 F. App'x. 624, 631 (6th Cir.
2010) (describing Buckeye as holding that argument that
contracts "violated state statutes and were therefore void *ab
initio*" were "subject to arbitration"); Madura v. Countrywide
Home Loans, Inc., 344 F. App'x. 509, 515 (11th Cir. 2009)
(describing Buckeye in a parenthetical as "concluding that a
claim that the entire contract is illegal and void ab initio
under state law must be arbitrated"); Koch v. Compucredit Corp.,
543 F.3d 460, 464 (8th Cir. 2008) (describing Buckeye as holding
that argument that contract was "void and illegal *ab initio*" was
arbitrable because "[t]he issue of the *contract's validity* is
different from the issue whether any agreement between the
alleged obligor and obligee *was ever concluded.*") (emphasis in
original); Sleeper Farms v. Agway, Inc., 506 F.3d 98, 103 (1st
Cir. 2007) (citing Buckeye and Prima Paint for the proposition
that plaintiff's "'void ab initio' argument goes to the validity

of the substantive provisions of the contract, not to arbitrability.  As a matter of federal law, the arbitration clause is unaffected even if the substance of the contract is otherwise void or voidable").

Plaintiff may question the wisdom of the distinction the federal courts have drawn between claims that a contract is void *ab initio* due to fraud in the execution and claims that a contract was void *ab initio* due to its illegality under state law.  However, the duty of this Court is to apply the law as directed by the Third Circuit and the Supreme Court.  Accordingly, the Court finds that Plaintiff's challenge to the contract on the basis that its purpose is illegal under New Jersey law is beyond this Court's ability to adjudicate and must be reserved for arbitration.  As the Court explained above, the issue of arbitrability remains undecided at this stage, due to Plaintiff's colorable claim that the fee-shifting provisions found in the arbitration agreement are substantively unconscionable.  The Court will therefore not address Plaintiff's arguments or evidence regarding promotion of prostitution, and the final determination as to whether her claims must be submitted to arbitration will be reserved until after the parties have engaged in limited discovery on that question.

### E. <u>Arguments Regarding Discovery</u>

Finally, Defendant, at the end of its reply brief, asserts that Plaintiff cannot now pursue discovery in this action because Magistrate Judge Williams previously denied her motion for discovery on these subjects.  According to Defendant, if Plaintiff still wished to seek arbitration-related discovery, the proper avenue "would have been to seek a reconsideration or appeal to the United States District Court Judge."  (ECF No. 30 at 8).  Defendant both misunderstands the nature of Judge Williams' Order, and the procedural posture of this case.

Judge Williams' Order did not purport to be the final word on arbitration-related discovery in this action.  In fact, Judge Williams specifically clarified that "Plaintiff is not foreclosed from seeking discovery in her response to Defendant's Motion and within the proceedings concerning that Motion."  (ECF No. 26 at 18).  Further, Judge Williams noted the possibility that this Court may "determine that discovery is needed to resolve the issue of the validity of the delegation provision once the matter has been more fully developed and briefed."  <u>Id</u>. The parties have since further developed and briefed their arguments on that point, and the Court has made exactly that determination.  When the existence of an enforceable arbitration agreement is put in doubt, this Court must deny a motion to compel and allow for targeted discovery.

Accordingly, Plaintiff will be permitted to engage in limited discovery on the question of whether pursuing arbitration would be cost-prohibitive.  While Plaintiff has submitted specific, detailed requests regarding the specific discovery avenues she should be permitted to pursue, and the specific number of discovery requests she would like to make, the Court leaves to the sound discretion of the able Magistrate Judge assigned to this matter to address such questions.

## CONCLUSION

For the reasons expressed above, Defendant's motion to compel arbitration and stay litigation (ECF No. 28) will be denied without prejudice.  The parties will be directed to engage in limited discovery regarding whether the fee-shifting provisions in the arbitration agreement would render arbitration too cost prohibitive for Plaintiff to pursue, after which Defendant may renew its motion to compel, which will be assessed under the summary judgment standard.

An appropriate Order will be entered.

Date:  June 21, 2021                 /s Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.

44